## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UCHE PHILIP MORDI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:11-CV-00193-NJR |
| | ) | |
| TODD ZEIGLER and | ) | |
| NATHAN ZERRUSEN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Uche Philip Mordi alleges that Defendants violated his constitutional rights by subjecting him to a traffic stop without probable cause and unlawfully prolonging the stop to allow a drug sniffing canine to arrive to the scene. Before the Court is a motion for summary judgment on the merits filed by Defendants Todd Zeigler and Nathan Zerrusen. (Doc. 177). Mordi opposes the motion. (Doc. 183). For the reasons delineated below, the Court grants the motion for summary judgment filed by Zeigler and Zerrusen.[1]

### FACTUAL BACKGROUND

Mordi is a black male who was a college student in Illinois in March 2009. (Doc. 183-1, ¶1). On March 12, 2009, Mordi and a passenger, Aderinola Otesile, were traveling southbound on I-57 in Mordi's vehicle. (*Id.* at ¶2). On that date, Zeigler and

---

[1] This case was originally assigned to District Judge Michael J. Reagan and Magistrate Judge Stephen C. Williams, who have both now retired from this district court. The action and the pending motion for summary for summary judgment were transferred to the undersigned on April 1, 2019.

Zerrusen were troopers with the Illinois State Police and were on duty in separate and marked squad cars on I-57 in Effingham County. (*Id.* at ¶¶5, 6, 8, 9).

While on patrol, Zeigler typically checks for seatbelt compliance, driver safety issues, speeding, and vehicle and equipment violations. (Doc. 183-1, ¶10). The front license plate was not attached to the front of Mordi's vehicle, but was instead displayed in the front windshield. (*Id.* at ¶3). In Illinois, registered vehicles are required to display front license plates by attaching them to the front of the vehicle. (*Id.* at ¶12). The front license plate cannot be displayed in the front windshield. (*Id.*).

When Zeigler activated his squad car's lights to pull Mordi over, the dashboard camera in his car automatically began to record audio and video of the traffic stop. (Doc. 183-1, ¶15). Shortly after Zeigler approached the car and spoke with Mordi through the passenger side window, the dispatcher notified Zeigler that Mordi had an outstanding warrant. (*Id.* at ¶17). The warrant was for failure to appear for possession of cannabis. (*Id.*). Zeigler could not enforce the warrant, however, because it was outside his geographic limits. (*Id.*).

At Zeigler's direction, Mordi exited his car and entered Zeigler's vehicle; in doing so, Zeigler stated the following to Mordi: "I want to check you out, and I want to get you moving here." (Doc. 183-1, ¶24). While Mordi was in Zeigler's vehicle, Zeigler stated: "I'm trying everything to get you moving here." (*Id.* at ¶26). Zeigler then informed Mordi of the outstanding warrant and gave a phone number for Mordi to call to resolve the matter. (*Id.*). Mordi indicated to Zeigler that the warrant should no longer be an issue. (*Id.*).

Mordi asked Zeigler if it was illegal to put a license plate in the front windshield, to which Zeigler responded that it was, but that he was not going to write him a ticket. (Doc. 183-1, ¶27). Instead, Zeigler issued Mordi a warning for the license plate. (*Id.* at ¶28). Drivers can receive full tickets, as opposed to just warnings for license plate violations, but Zeigler issued only a warning (and not a ticket) for this violation. (*Id.* at ¶29).

Zerrusen arrived on scene and announced his arrival over the radio less than six minutes after Zeigler pulled over Mordi. (Doc. 183-1, ¶30). Typically, Zerrusen will try to assist another officer making a traffic stop if he is free and in the area. (*Id.* at ¶19). Zerrusen and Zeigler did not communicate about the details of the traffic stop prior to Zerrusen announcing his arrival. (*Id.* at ¶31).

Zeigler explained to Mordi that Zerrusen had arrived for safety reasons because he had an outstanding warrant. (Doc. 183-1, ¶32). When Zeigler asked Mordi if there was anything illegal in the car, Mordi responded, "[t]here isn't anything[.]" (*Id.* at ¶36). Mordi twice said "no" when Zeigler repeatedly asked him if a dog would alert to anything. (*Id.* at ¶37). After those inquiries, Mordi refused to give Zeigler consent to search his vehicle. (*Id.* at ¶38). Zeigler informed Mordi that he had not had the best contacts with law enforcement in the past. (*Id.* at ¶40). Nine minutes after Zeigler pulled Mordi over, he called Effingham County Sheriff's Deputy Rob Rich to bring a drug-sniffing dog. (*Id.* at ¶41).

While waiting for the drug dog, Zeigler spoke with Otesile, Mordi's passenger. (Doc. 183-1, ¶44). Zeigler told Otesile that the K-9 was about four miles away and asked

if there was anything illegal in the car. (*Id.*). Otesile denied that there were any illegal substances in the vehicle. (*Id.*). Zeigler then spoke with Zerrusen and told him that Otesile had marks on his lip as though he had been smoking a lot. (*Id.* at ¶46). Zeigler also said that Deputy Rich was about four miles away and asked Zerrusen to have Deputy Rich run the dog around the car when he arrived. (*Id.*).

Zerrusen went back to his squad car to wait for Deputy Rich and his drug dog. (Doc. 183-1, ¶48). Zerrusen did not communicate with Zeigler or Mordi during this time. (*Id.*). Meanwhile, in his squad car, Zeigler gave Mordi a copy of the written warning for the plate violation and explained that he called for the dog because he was concerned about pounds of drugs. (*Id.* at ¶49). Zeigler also explained how the dog sniff would work. (*Id.*). Zeigler then told Mordi, "I'm not trying to hold you up long, I'm trying to get this moving." (*Id.* at ¶50).

Sixteen minutes after Zeigler first pulled over Mordi, and seven minutes after he called for the dog, Deputy Rich arrived so that his dog could conduct a free air sniff around Mordi's vehicle. (Doc. 183-1, ¶51). Seventeen minutes after Zeigler first pulled Mordi over, eight minutes after he called for the dog, and one minute after the dog began walking around the car, Zeigler informed Mordi that the dog had alerted to illegal substances in the car. (*Id.* at ¶52). After the dog alerted, Zeigler conducted a safety pat-down of Mordi and Otesile. (*Id.* at ¶53).

Zeigler and Deputy Rich then searched Mordi's car. (Doc. 183-1, ¶54). Zerrusen stood with Mordi and Otesile in front of Zeigler's squad car, watching them for safety reasons. (*Id.*). The vehicle search eventually yielded a duffel bag that contained about

509.5 grams of crack cocaine and about $7,000 cash in small bundles. (*Id.* at ¶56). Mordi and Otesile were then placed under arrest. (*Id.* at ¶57). Zeigler read the two their Miranda rights, and afterwards Mordi confirmed the duffel bag belonged to him. (*Id.* at ¶58). Mordi was secured in Zeigler's squad car, while Otesile was secured in Zerrusen's squad car. (*Id.* at ¶59).

Zeigler initiated the traffic stop and maintained primary authority over it the whole time. (Doc. 183-1, ¶64). Typically, the officer who initiates the traffic stop retains control of it, even if assisting officers arrive on the scene. (*Id.* at ¶63). Zerrusen was not involved with the decision to pull Mordi over or call for the drug dog. (*Id.* at ¶65).

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV. P. 56(a)). *Accord Anderson v. Donahue*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-moving party. *See Anderson* 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a)," we set forth the facts by

examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

ANALYSIS

I.      **Fourth Amendment Search and Seizure**

      A.      **The Initial Traffic Stop**

Mordi first asserts that there was no probable cause to support the traffic stop conducted by Zeigler. Mordi further alleges that he was illegally profiled and stopped because of his race. But the undisputed facts how that Zeigler did, in fact, have probable cause to stop Mordi's vehicle. Mordi acknowledges that vehicles registered in Illinois are required to display a front license plate by attaching the plate to the front of the vehicle. (Doc. 183-1, ¶ 13). However, Mordi's front license plate was displayed in the front windshield of his vehicle. *Id.*

Under Illinois law, "every registration plate . . . shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued . . . ." 625 ILL. COMP. STAT. § 5/3-413(b). A registration plate "shall be attached thereto, one in the front and one in the rear." 625 ILL. COMP. STAT. § 5/3-413(a). "[N]o person shall operate, . . . , a vehicle upon any highway unless there shall be attached thereto and displayed thereon when and as required by law, proper evidence of registration in Illinois[.]" 625 ILL. COMP. STAT. § 5/3-701(a). Proper evidence of registration requires "[a] current and valid Illinois registration sticker or stickers and plate, . . . ." 625 ILL. COMP. STAT. § 5/3-701(a)(1).

Displaying a required plate on the windshield of a vehicle is against the law and thus gave Zeigler probable cause to stop Mordi's vehicle. *See, e.g., People v. Parker*, 354 Ill. App. 3d 40, 47-48 (Ill. App. Ct. 2004)(noting that criminal defendant who displayed front license plate inside vehicle's front windshield was still in violation of § 413(a) and (b), and thus the officer had probable cause to initiate a traffic stop). *See also Overton v. Schuwerk*, No. 11-cv-3263, 2014 WL 3609934, at *3-4 (C.D. Ill. July 22, 2014)(holding that officer had probable cause for traffic stop based on violations of 413(a) and (b), where plaintiff admitted the front plate was missing and the rear plate had a clear cover).

Mordi seeks to avoid summary judgment by arguing that Zeigler stopped him because of his race. To support this claim, Mordi asserts that Zeigler pulled to the driver's side of his vehicle at which point Zeigler saw Mordi's face and the face of his passenger. (Doc. 183, ¶ 19). Mordi next claims that immediately after seeing that he and his passenger were black, Zeigler initiated the traffic stop. (*Id.*).

Even if Mordi's claimed subjective intent is ascribed to Zeigler, it does nothing to affect the fact that Zeigler had probable cause to stop Mordi's vehicle. This is because reasonableness under the Fourth Amendment is primarily an objective inquiry. *See Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000). The Fourth Amendment regulates conduct rather than thoughts. *See Bond v. United States*, 529 U.S. 334, 338 n.2 (2000). As such, an officer's conduct is reasonable regardless of the subject intent motivating the official in question. *See Whren v. United States*, 517 U.S. 806, 814 (1996). *See also Ashcroft v. Al-Kidd*, 563 U.S. 731, 737 (2011)(noting that prior Supreme Court precedent has "almost uniformly rejected invitations to probe subjective intent."); *United States v. Murray*, 89

F.3d 459, 461 (7th Cir. 1996)(stating that "ulterior motives do not invalidate a police stop for a traffic violation, no matter how minor, if a motor vehicle law infraction is detected.").

This prohibition on probing subjective intent even includes racial profiling claims, which was addressed by the Supreme Court in *Whren v. United States*, 517 U.S. 806 (1996). In *Whren*, the petitioners filed a pre-trial motion to suppress that argued that the officers lacked probable cause, as well as reasonable suspicion, that they were involved in illegal drug activity. *Id.* at 809. The petitioners also argued that the officers' reasons for stopping their vehicle, *i.e.*, to give the driver a warning regarding the traffic violations, was pretextual. *Id.* The petitioners further argued that in the context of enforcing civil traffic regulations, something more than probable cause was needed to stop a vehicle. *Id.* at 810. They reasoned that total compliance with traffic laws was nearly impossible and that police officers could almost always pull over a motorist for a technical violation. *Id.* They further argued that a higher standard would guard against the temptation to use traffic stops as a pretext to further investigations of other crimes as well as to stop motorists based on improper factors, such as race. *Id.*

The Supreme Court rejected the petitioners' argument and noted that its prior cases "foreclose[d] any argument that the constitutional reasonableness of a traffic stop depend[ed] on the actual motivation of the individual officer involved." *Whren*, 517 U.S. at 813. Thus, the Court held that where there was an objectively reasonable traffic stop, it would not look behind such a stop to determine whether racial profiling, a desire to investigate other potential crimes, or any other reason was the real motivation for the

stop. *Id.* The Court did agree, however, that the Constitution prohibited selective enforcement of the law based on considerations such as race, but such claims were not based on the Fourth Amendment, but rather on the Equal Protection Clause of the Fourteenth Amendment. *Id.*

Here, Mordi's claim is based on the Fourth Amendment, not the Equal Protection Clause of the Fourteenth Amendment. In his initial complaint, Mordi raised a number of alleged violations, including the Fourteenth Amendment. The district court ultimately dismissed his claims arising out of the traffic stop in its initial screening order. (Doc. 8). The Seventh Circuit, however, remanded the case after it reversed the district court's denial of the defendants' motion for summary judgment on qualified immunity grounds. *See Mordi v. Zeigler*, 770 F. 3d 1161, 1167 (7th Cir. 2014).[2]

After remand, Mordi filed a Rule 60 motion to vacate the initial screening order which dismissed his claims arising out of the traffic stop. (Doc. 129). Mordi specifically requested the initial screening order to be vacated "***insofar as it has dismissed Plaintiff's Fourth Amendment claim based upon alleged illegal and prolonged detainment, search, seizure, and arrest . . . .***" (*Id.* at p. 3 (emphasis added)). The district court ultimately denied Mordi's reconsideration request (Doc. 133), which Mordi subsequently appealed to the Seventh Circuit. The Seventh Circuit reversed the district court's ruling on Mordi's reconsideration request and stated the following:

---

[2]     Specifically, Mordi claimed that the defendants violated his rights under the Vienna Convention on Consular Relations when they failed to notify the Nigerian consulate of his arrest and detention. *See Mordi*, 770 F. 3d at 1162. The Seventh Circuit held that the district court erred in denying the grant of qualified immunity because the right Mordi complained of was not clearly established at the time. *Id.* at 1166-67.

> Mordi now argues that Officers Zeigler and Nathan Zerrusen violated his Fourth Amendment rights when they stopped the car he was driving. They did so, Mordi asserts, not because they had probable cause for the traffic stop, but because they were engaged in impermissible racial profiling. In addition, he argues, the officers unlawfully prolonged the stop so that they could bring a drug-sniffing dog to the car. We conclude that the district court acted prematurely, and that Mordi's Fourth Amendment claim may move forward.

*Mordi v. Zeigler*, 870 F.3d 703, 705 (7th Cir. 2017).

The undisputed facts show that Zeigler had probable cause to stop Mordi's vehicle because his front license plate was not properly affixed to the front of his car. While Mordi explains that he could not attach the license plate because the front of his vehicle was damaged, it does not detract from the fact that Zeigler had probable cause to initiate the stop for the traffic violation. The fact that Mordi believes he was stopped because of his race is of no import to his Fourth Amendment claims, as the Court made abundantly clear in *Whren*. Thus, Mordi's Fourth Amendment claim on the basis of the initial traffic stop fails.

### B.    The Prolonging of the Traffic Stop until the Arrival of a Drug Canine.

Mordi next claims that his Fourth Amendment rights were violated because Zeigler unreasonably prolonged the traffic stop to allow a drug sniffing canine to arrive. (Doc. 183, p. 10-18). Specifically, Mordi relies on *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), which addressed the question of whether the Fourth Amendment "tolerates a dog sniff conducted after completion of a traffic stop." *Id.* at 1612. In *Rodriguez*, the Supreme Court granted certiorari "to resolve a division among lower courts on the question

whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion." *Rodriguez*, 135 S. Ct. at 1614.

The Court answered the question in the negative and held that police could not extend such a stop beyond the time reasonably required to complete the mission of issuing the ticket. *See Rodriguez*, 135 S. Ct. at 1612. The Court reasoned that a seizure due to a traffic violation amounted to a "*Terry* stop" as opposed to a formal arrest. *Id.* Because the encounter was to be treated as a *Terry* stop, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Id.* at 1614 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Thus, the Court reasoned that "[a]uthority for the seizure [] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Such tasks include checking the driver's license, registration, proof of insurance and determining the existence of any outstanding warrants. *Id.* at 1615. The Court acknowledged that an officer may conduct unrelated checks during a traffic stop, but could not do so in a manner that prolongs the stop unless there is reasonable suspicion. *Id.* To that end, the Court reasoned that a dog sniff was not an "ordinary incident of a traffic stop" because it lacked "the same close connection to roadway safety" and was thus not a part of the officer's traffic mission. *Id.*

Mordi argues that *Rodriguez* controls the outcome of this case. Mordi claims that Zeigler informed Mordi from the outset that he only intended to write him a warning ticket. After Zeigler returned the relevant documents (driver's license, proof of insurance, etc.) to Mordi and his passenger, the mission of the traffic stop was completed, even

though Zeigler had not formally written and handed the warning to Mordi. As such, Zeigler could not detain Mordi and his passenger beyond that point absent evidence of reasonable suspicion, which Mordi claims Zeigler did not have.[3]

The question now turns to whether Zeigler had reasonable suspicion to detain Mordi for the dog sniff. Even though the scope and duration of a traffic stop are limited to fulfill its purposes, such a stop may be extended if during the course of the stop, the officer discovers information that gives him reasonable suspicion of other illegal activity. *See United States v. Walden*, 146 F.3d 487, 490 (7th Cir. 1998). Reasonable suspicion has been described as "something less than probable cause but more than a hunch." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). The existence of reasonable suspicion also depends on "the totality of the circumstances known to the officer at that time including his experiences and common sense." *United States v. Wyatt*, No. 04-3314, 133 F. App'x 310, 313 (7th Cir. May 16, 2005). Finally, the reasonable suspicion analysis "'does not deal with hard certainties, but with probabilities'" that require a "practical determination" . . . "as to whether the articulable facts . . . reasonably would 'raise a suspicion that the particular individual[s] being stopped [were] engaged in wrongdoing.'" *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997).

Mordi argues that Zeigler lacked reasonable suspicion of any criminal activity. Zeigler counters that he did based on the following nine factors:

---

[3]      In *Rodriguez*, there appeared to be no indication of any objective facts, apart from the violation of the traffic laws, that would justify holding the petitioner for the dog sniff. As such, the Supreme Court remanded back to the Eighth Circuit for consideration of whether there was reasonable suspicion. *See Rodriguez*, 135 S. Ct. at 1616-17.

(1)     Mordi and his passenger made movements inside the car as if they were trying to hide something;

(2)     Mordi was wanted on a warrant for failure to appear for possession of cannabis;

(3)     Mordi placed his hand on the gear shift as if he was ready to leave after Zeigler finished discussing the license plate and popped hood with him;

(4)     Zeigler noticed ashes, cigar, tobacco and tobacco wrappings while at the passenger side window;

(5)     Mordi and his passenger both had red eyes and appeared strained or exhausted;

(6)     Mordi exhibited slow movements while getting out of the vehicle;

(7)     Zeigler asked Mordi if he had anything illegal in the vehicle to which he responded, "there shouldn't be";

(8)     Zeigler asked Mordi if a drug sniffing canine would alert to any illegal substances in the car, to which he responded "he did not think so"; and

(9)     Zeigler observed Mordi quivering and staring at the floor after Mordi denied Zeigler's request to search the vehicle.

(Doc. 177, p. 13-14).

Mordi disputes most of the above facts, as well as the characterizations given to such facts by Zeigler. Of course, the Court must view the facts and draw all reasonable inferences in the light most favorable to Mordi. *See Delapaz*, 634 F.3d at 899. As such, the undersigned accepts the following facts for purposes of conducting its reasonable suspicion analysis:

• Mordi did not put his hand on the gearshift while in Zeigler's presence. (Doc. 183, p. 14; Doc. 183, ¶14);

• There were no ashes, cigar tobacco and tobacco wrappings in Mordi's vehicle. (Doc. 183, p. 14-16; Doc. 183-1, ¶21);

- Mordi and his passenger did not have red eyes and did not appear to be strained or exhausted. (Doc. 183, p. 16; Doc. 183-1, ¶23);

- Mordi did not exhibit slow movements while getting out of his vehicle. (Doc. 183, p. 17; Doc. 183-1, ¶25);

- Mordi did not make an equivocal denial when asked by Zeigler whether he had anything illegal in his vehicle. (Doc. 183, p. 17; Doc. 183-1, ¶36).

- Mordi did not make an equivocal denial when asked by Zeigler whether a drug sniffing dog would alert to any illegal substances in the vehicle . (Doc. 183, p. 17-18; Doc. 183-1, ¶37).

- Mordi did not quiver or stare at the floor after he denied permission for Zeigler to search the vehicle. (Doc. 183, p. 18; Doc. 183-1, ¶39).

The parties, however, do not dispute that Mordi had an outstanding warrant for failure to appear related to a possession of cannabis charge. (Doc. 183-1, ¶17). The parties also do not dispute that Mordi and his passenger were moving inside the vehicle after they were pulled over and prior to Zeigler's approach. (*See, e.g.,* Doc. 183, p. 13 (acknowledging that there was some movement in the car)). While Mordi initially denied that he and his passenger moved inside the vehicle (Doc. 183-1, ¶16), there is video and audio taped evidence of the encounter. (Doc. 183-1, ¶15). The undersigned's review of the encounter confirms that the individuals were moving inside the vehicle prior to Zeigler approaching. As such, the Court disregards Mordi's denial. *See, e.g., Scott v. Harris*, 550 U.S. 372, 380 (2007)(noting that in summary judgment context videotaped evidence controlled over the plaintiff's version of events and that the court should have viewed facts in the light depicted by the videotape).

Here, the undisputed facts show that Mordi had an outstanding warrant for failing to appear on a cannabis charge. While Zeigler could not act on the warrant because it was out of his jurisdiction (Doc. 183, ¶29), the warrant indicated that Mordi had a prior criminal history involving illegal drugs. This is confirmed by the fact that in the past Mordi did not have the best contacts with law enforcement. (Doc. 183-1, ¶40). Although reasonable suspicion cannot be based solely on a person's prior criminal history (*see Jerez*, 108 F.3d at 693), prior criminal history in conjunction with another factor can form the basis for reasonable suspicion. *See, e.g., Walden*, 146 F.3d at 490-491 (finding reasonable suspicion based solely on prior criminal history and an officer safety alert indicating that the defendant was generally involved in gang crime activity, even though the alert could not be used to arrest or detain the individual in question).

The videotape provides the second factor, which shows Mordi and his passenger moving prior to Zeigler approaching the vehicle. Zeigler thought this was unusual, and he believed it could indicate that they were trying to hide something. Indeed, the instant facts are similar to *United States v. Cooks*, No. 03-4035, 168 F. App'x 93 (7th Cir. Feb. 15, 2006). In *Cooks*, the defendant moved to suppress arguing, among other things, that the officer had stalled in writing a speeding ticket so that the drug dog could arrive and walk around the vehicle. *Id.* at 94. The officer ran a computer check and discovered that the defendant had multiple arrests for drugs and weapons offenses. *Id.* The officer started to write the ticket and then noticed the defendant make various movements inside the vehicle, which included disappearing from view at certain points. *Id.* A drug dog eventually arrived and alerted to the vehicle approximately eleven minutes after the

officer first approached the defendant's car. *Id.* at 95. The Seventh Circuit affirmed the denial of the defendant's motion to suppress holding that the defendant's furtive movements gave the officer reasonable suspicion to investigate further. *Id.* at 96-97. Thus, based on *Cooks* alone, it appears that Zeigler had sufficient reasonable suspicion to detain Mordi until the arrival of the drug dog.

While the movements of the defendant in *Cooks* were arguably more pronounced than Mordi's movements in this case, there is still additional evidence that supports the existence of reasonable suspicion. For example, Mordi acknowledges that Zeigler believed he saw cigar wrappings and blunt materials in the vehicle. (Doc. 183, ¶10). Mordi denies that any such wrappings and materials existed. (Doc. 183-1, ¶21). The reasonable suspicion analysis, however, does not turn on whether such items existed. What is relevant is that Zeigler believed there were cigar wrappings and blunt materials present. Similar to a probable cause analysis, the reasonable suspicion analysis is based on the officer's observations and the inferences he draws from such observations based on the officer's experience, which in this case is ten years as a K-9 officer. (Doc. 183-1, ¶22). Because the analysis is based on probabilities, the officer may ultimately be proven wrong, but it does not detract from the fact that there was probable cause or reasonable suspicion in the first place.

Here, Zeigler initially believed he saw cigar wrappings and blunt materials in the vehicle.[4] Zeigler's initial belief was supported by the undisputed fact that he observed

---

[4]     Zeigler testified that it was not unusual in his experience to see remains of blunts in a vehicle, but not find traces of cannabis if the suspect had consumed it. (Doc. 177-1, ¶37). Deputy Rich also testified that

that Mordi's passenger had marks on his lips as if he had been smoking a lot. (Doc. 183-1, ¶46). Zeigler's initial belief is further corroborated by the undisputed fact that during the vehicle search at the scene (after the drug canine had alerted) that Zeigler pointed out to Deputy Rich (the drug canine handler) that "there's blunt materials right there." (Doc. 183-1, ¶55). Given the combination of what appeared to be furtive movements in the vehicle, past criminal history involving drugs, and what Zeigler initially believed to be evidence of smoking and blunt materials, Zeigler was more than justified in detaining Mordi and his passenger until his suspicions were alleviated.

Admittedly, the quantum of evidence supporting reasonable suspicion appears to be somewhat limited. However, the Seventh Circuit has previously found reasonable suspicion based on evidence (in terms of nature and quantity) similar to that found here. *See, e.g., United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996)(finding reasonable suspicion based on nervous behavior, prior criminal history and fact that defendant was driving a rental to and from California); *United States v. Rogers*, 387 F.3d 925, 934 n.9 (7th Cir. 2004)(finding reasonable suspicion based on nervous behavior, prior criminal history and odd odor emanating from the vehicle). Thus, the Court concludes that Zeigler had sufficient reasonable suspicion to detain Mordi for the dog sniff and that Mordi's Fourth Amendment rights were not violated through the prolonging of the traffic stop.[5]

---

ashes and wrappings alone would not necessarily be listed on reports or evidence sheets if the officers did not actually find actual contraband such as cannabis. (Doc. 177-6, p. 40-43, 49-53).

[5]      In an attempt to create an issue of material fact, Mordi attaches a number of exhibits to his response in opposition to Defendants' motion for summary judgment. Exhibit C, for example, contains documents from the Effingham County Sheriff's Department, consisting of booking photos, arrest sheets, and police reports of the incident. (Doc. 183-2, p. 47-69). The documents were attested to by a custodian and thus were

C.      **Qualified Immunity**

Even if Zeigler violated Mordi's Fourth Amendment rights by prolonging the traffic stop, he would still be entitled to summary judgment based on qualified immunity. Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when []he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs:  (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly

---

properly authenticated. The Court did consider these documents and viewed them in the light most favorable to Mordi.

Mordi also relies on other documents, however, which were not properly authenticated. For example, he attaches several reports from the Illinois State Police. *See, e.g.,* Exh. G—Crime Scene Report (Doc. 183-2, p. 83-84); Exh. H.—Evid. Inventory and Receipt (Doc. 183-2, p. 85-86); Exh. I—Evid. Inventory and Receipt (Doc. 183-2, p. 87); Exh. K—Univ. of Illinois-Chicago Statistical Study (Doc. 183-2, p. 99-117). None of these documents was properly attested to by a custodian or the author of the document, and none of these documents was created by either of the two defendants in this case. To survive summary judgment, Mordi must present the Court with competent and admissible evidence. *See Jones v. City of Elkhart*, 737 F.3d 1107, 1113 (7th Cir. 2013). Because Mordi failed to show that the attached documents were admissible in evidence, the Court did not consider them in its analysis. The statistical study submitted by Mordi, however, is addressed in the racial profiling section.

established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). If the answer to either inquiry is no, then the defendant official is entitled to summary judgment. *See Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014).

The first inquiry regarding whether Zeigler's conduct violated a constitutional right is purely a legal question. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995). It asks whether the plaintiff has alleged facts indicating a violation of clearly established law. Mordi relies on *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and argues that the police need reasonable suspicion to extend a completed traffic stop to conduct a dog sniff. While the Court found that there was reasonable suspicion, the Court will assume for purposes of this analysis that Zeigler lacked reasonable suspicion to extend the traffic stop.

The question now turns to the second prong and asks whether the right at issue was "clearly established" at the time of the alleged misconduct. To be "'clearly established' a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015)(citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id*. That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Carroll v. Carmen*, 135 S. Ct. 348, 350 (2014).

It is important to note that the second prong of the qualified immunity analysis has a temporal element. The Supreme Court decided *Rodriguez* in 2015, but the traffic stop in question occurred in 2009. Thus, the Court must determine whether the right in question was clearly established as of the date of the traffic stop, which in this case was March 12, 2009. *See, e.g., Khuans v. School Dist. 110*, 123 F.3d 1010, 1018-19 (7th Cir. 1997)(finding that defendant was entitled to qualified immunity because the law regarding First Amendment retaliation claims brought by independent contractors was unclear at the time the plaintiff's contract was not renewed); *Humphrey v. Staszak*, 148 F.3d 719, 728 (7th Cir. 1998)(holding that the officer did not violate a clearly established law and was entitled to qualified immunity because even though the officer did not have actual probable cause to arrest, he had "arguable" probable cause to arrest based on the state of Illinois law at the time of the arrest).

The Court must next determine the scope of the right at issue with sufficient particularity to make the analysis of the second prong meaningful. Here, the particular right at issue based on the facts of this case is similar to the precise question addressed by the Supreme Court in *Rodriguez*, *i.e.*, "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Rodriguez*, 135 S. Ct. at 1614. The question then becomes whether as of March 12, 2009, it was clearly established that an individual (in the absence of reasonable suspicion) had a right not to be subjected to a dog sniff after completion of a routine traffic stop.

At first glance, it appears that the right was clearly established at the time of the stop. For example, the Supreme Court in *Rodriguez* cited favorably to *Illinois v. Caballes*,

543 U.S. 405 (2005). In *Caballes*, the Supreme Court noted "that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Id.* at 407. The Supreme Court further went on to say that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* The Supreme Court in *Rodriguez* relied heavily on the aforementioned quote to conclude that police needed reasonable suspicion to conduct a dog sniff after completion of a routine traffic stop. *See Rodriguez*, 135 S. Ct. at 1614-15.

The Supreme Court's holding in *Rodriguez* turned on the characterization of a routine traffic encounter as a *Terry* stop, which is based on *Terry v. Ohio*, 392 U.S. 1 (1968). *Terry* established principles for investigatory detention and held that law enforcement officers could not investigate potential crimes other than the one that led to the initial stop or encounter, unless there was reasonable suspicion to do so. *Id.* at 20-22. At the time of the stop in 2009, however, the Seventh Circuit did not treat a traffic stop supported by probable cause as a *Terry* stop. Instead, a traffic stop that was supported by probable cause was deemed to be an arrest. *See United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002).

This is a critical distinction because "arrests are fundamentally different from *Terry* stops." *Childs*, 277 F.3d at 952. A *Terry* stop, for instance, has to "be limited in time and scope." *Id.* The same constraints are not applicable for arrests. For example, the Seventh Circuit noted that "[p]ersons who are arrested may be taken to the station house for booking, even if the only penalty for the offense is a fine . . . ." *Id.* Simply put, probable

cause "justifies a custodial arrest" and "all the implications that follow from . . . believ[ing] that an offense has been committed." *Childs*, 277 F.3d at 952-953.

One of the aforementioned implications that guided the Seventh Circuit's decision in *Childs* is that persons arrested based on probable cause, unlike those stopped based on reasonable suspicion, "need not be released as quickly as possible." *Childs*, 277 F.3d at 952. The Seventh Circuit noted that with respect to a person arrested with probable cause the only restriction placed on a law enforcement officer is that the "custody's nature and duration must be 'reasonable'. . . ." *Id*. The Court reasoned that such persons did not have a right to be released immediately upon completion of the various aspects of the traffic stop, *i.e.*, license, registration and warrant check plus writing of the ticket. *Id*. at 953. Because the officer could have taken the defendant "to a police station for booking, any less time-consuming steps [we]re proper." *Id*.

Because of the holding and reasoning in *Childs*, the Fourth Amendment reasonability analysis in subsequent cases tended to focus on the length of time a dog sniff added to the traffic stop. Thus, the prevailing law in the Seventh Circuit at the time of the stop was that as long as there was not excessive delay (given the particular factual circumstances), it was not unreasonable to hold a motorist for a dog sniff where the traffic stop was supported by probable cause. This is true, despite the admonition in *Caballes* (cited with approval by the Supreme Court in *Rodriguez*) that a seizure "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407. *See, e.g., United States v. Carpenter*, 406 F.3d 915, 916-917 (7th Cir. 2005)(relying on *Caballes* and holding that delay of approximately five minutes

until arrival of drug dog did not make the stop unreasonable); *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005)(relying on *Caballes* and holding there was no unreasonable delay in detaining the defendant for drug sniffing investigation that began twenty minutes after a drug dog was summoned). *See also United States v. Muriel*, 418 F.3d 720, 725-726 (7th Cir. 2005)(relying on *Caballes* and holding that the thirteen minutes that elapsed between the initial stop and defendant providing consent to search was not unreasonably prolonged). Even after the date of the traffic stop in question (and prior to *Rodriguez*), the focus on the length of the stop remained consistent. *See, e.g., United States v. McBride*, 635 F.3d 879, 882 (7th Cir. 2011)(rejecting defendant's argument that traffic stop was unreasonably drawn out with investigatory questions unrelated to stop and finding that length of delay not unreasonable where approximately 25 minutes elapsed between the initial stop and when defendant consented); *Buchanan v. Kelly*, No. 13-2464, 592 F. App'x 503, 506 (7th Cir. Nov. 10, 2014)(rejecting plaintiff's argument that the approximately 30 minutes that elapsed between the records check and start of the dog sniff was unreasonable, even though noting that it was "at the outer bounds of reasonableness[.]").

Indeed, the Seventh Circuit was not the only Court of Appeals to analyze whether time added to a traffic stop from a dog sniff made the stop unreasonable under the Fourth Amendment. For example, in *Rodriguez*, the district court adopted the report and recommendation of the magistrate judge, which concluded that the dog sniff only added 7 to 10 minutes to the stop, and thus did not amount to a delay of constitutional significance. *See Rodriguez*, 135 S. Ct. at 1614. The Eighth Circuit affirmed, noting that the

delay was similar to previous delays the court had deemed as acceptable, and thus considered the incident as a "*de minimis* intrusion on [the defendant's] personal liberty." *Id.*

In light of the above, it is evident that there was not a "clearly established" right to be free from a dog sniff after the conclusion of a traffic stop as of March 12, 2009. Mordi, for example, can only rely on *Caballes* for the general proposition that a lawful stop can become unlawful if prolonged beyond the time needed to complete the stop. However, the particular facts and assumptions made by the Court in that case show that it did not clearly establish such a right. First, the question addressed by the Court was very narrow: "[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle ***during a legitimate traffic stop***." *Caballes*, 543 U.S. at 407 (emphasis added). Second, in addition to assuming a legitimate traffic stop, the Court also proceeded from the assumption that the officer had no basis for conducting the dog sniff other than the traffic violation. *Id.* at 407. The Court ultimately concluded that the use of a drug dog did not violate the Fourth Amendment with the Court reasoning that there was no legitimate privacy interest in the possession of contraband. *Id.* at 408-409. Thus, after *Caballes,* it would not be clear to an enforcing official that detaining an individual to conduct a dog sniff would result in an unconstitutional prolonging of a traffic stop. As such, *Caballes* is clearly of no assistance to Mordi, especially given the existence of a proper traffic stop in this case.

*Rodriguez* did establish the right sought by Mordi, but that did not occur until 2015, more than six years after the stop in question. The prevailing law at the time treated

Mordi's traffic stop, not as a *Terry* stop, but as a full blown arrest because it was supported by probable cause. As a result, cases in the Seventh Circuit tended to focus on the total time added to the stop as a result of the dog sniff. The cases cited above indicate that delays between five minutes (*see Carpenter*, 406 F.3d at 916-917) and twenty minutes (*see Martin*, 422 F.3d at 602) did not violate the Constitution. Here, the parties agree that "[s]eventeen minutes after Trooper Zeigler first pulled over [Mordi], eight minutes after he called for the dog, and one minute after the dog began walking around the car, Trooper Zeigler informed [Mordi] the dog had alerted to illegal substances in the car." (Doc. 183-1, ¶52). Zeigler also testified in his deposition that he would typically wait for about ten minutes and if he could not get a drug dog within that time frame, he would let the motorist go. (Doc. 184-1, p. 18). Thus, Zeigler's actions and beliefs were consistent with the prevailing authority at the time of the stop. Finally, even if Zeigler was mistaken about the law, it was an honest and reasonable mistake given that prevailing cases at the time. Accordingly, the Court finds that Zeigler is entitled to qualified immunity on Mordi's Fourth Amendment claim based on the prolonging of the traffic stop.

## II.   Racial Profiling Claim under the Fourteenth Amendment

The Court previously addressed Mordi's Fourteenth Amendment racial profiling claims ruling that Mordi did not properly preserve such claims in his Motion for Reconsideration of the dismissal of the initial screening order. The parties briefed the merits of this claim, however, and the Court will proceed to address it. To the extent that Mordi properly preserved any Fourteenth Amendment Equal Protection claims, such claims fail for lack of evidence.

A.      **Discriminatory Effect**

Mordi claims he was the victim of racial profiling. Such claims are grounded in the

Equal Protection Clause of the Fourteenth Amendment. *See Chavez v. Illinois State Police*,

251 F.3d 612, 635 (7th Cir. 2001). In order to establish such a claim, Mordi must prove two

things, the first of which is that a defendant's "actions had a discriminatory effect . . . ."

*Id.* To prove discriminatory effect, Mordi must "show that [he] [is a] member[] of the

protected class, that [he] [was] otherwise similarly situated to members of the

unprotected class, and that [he] [was] treated differently from members of the

unprotected class." *Id.* at 636.

To show discriminatory effect, Mordi relies on a 2009 statistical study conducted

by the University of Illinois at Chicago that examined traffic stop statistics in the State of

Illinois, which showed that minorities were more likely to be stopped than a Caucasian

driver. (Doc. 183-2, Exh. K-L, p. 99-117). Zeigler argues that the statistics are irrelevant

because they do not address the specific Defendants or even the county in which Mordi

was arrested. (Doc. 184, p. 8). Zeigler further argues that the statistics are not suited to

the present case because of the focus on consent searches and the fact that the statistics

do not address the use of drug dogs. *Id.* at p. 10. Finally, Zeigler asserts that the statistics

are too general and do not provide any concrete evidence about Zeigler's stop history. *Id.*

As an initial matter, the Court notes that the statistical study relied on by Mordi

was simply attached to his response in opposition to Defendants' motion for summary

judgment. (Doc. 183-2, Exh. K-L, p. 99-117). Mordi made no attempts to authenticate the

study, such as providing an affidavit from the author. Zeigler opposed the use of the

statistics in part because Mordi did not properly disclose a witness to testify about the report. In essence, Mordi seeks to have the Court consider expert testimony without complying with the expert disclosure rules. The Court will not permit this end run around the expert disclosure rules, and as such, the Court need not consider this evidence because it is not admissible. *See, e.g., Aguilera v. Cook County Police and Corrections Merit Board*, 760 F.2d 844, 849 (7th Cir. 1985)(noting that "the court may consider any material that would be admissible or usable at trial.")(citation omitted). *See also Bloodworth v. Village of Greendale*, No. 10-C-0273, 2011 WL 98835, at *5 (E.D. Wisc. Jan. 12, 2011)(refusing to consider police reports for purposes of summary judgment because they were not properly authenticated).

Even if the Court were to consider such evidence, it is too general to establish discriminatory effect. The seminal case in the Seventh Circuit for the use of statistics in equal protection cases is *Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001). The Seventh Circuit specifically rejected a claim that statistical disparity in traffic stops was enough by itself to establish racial profiling. The Seventh Circuit did note that such evidence could be sufficient to establish discriminatory effect, however, any such expert analysis had to be both relevant and reliable. *Id.* at 641. The Court reasoned that the plaintiff's evidence was insufficient because it did not contain reliable data on whom the officers stopped, detained, and searched. *Id.* at 643. The Court also noted that the plaintiff did not have reliable data indicating the population on the highways where motorists were stopped, detained and searched. *Id*. at 643-644. Without such data, the plaintiff

failed to prove that the officer's actions had a discriminatory effect on the plaintiff. *Id.* at 645.

Of critical importance to the Court's analysis in *Chavez* was the general nature of the statistics provided by the plaintiffs. For example, the plaintiffs attempted to provide comparative racial information by comparing the racial numbers obtained from the field reports of troopers involved in Operation Valkyrie with the overall racial population in the State of Illinois based on census data. *See Chavez*, 251 F.3d at 643. The Court noted, however, that the census data, even if accurate, was too general and of no help in "determining the population of motorists encountered by the Valkyrie officers." *Id.* at 643-644. Thus, the statistics did "not indicate whether Valkyrie officers disproportionately stop, detain, and search Hispanics and African-Americans." *Id.* at 643.

What *Chavez* makes clear is that in order for statistics to be relevant and reliable, they must be tailored to the surrounding facts and circumstances. Here, Mordi relies on two sets of data to support his argument that Zeigler's actions had a discriminatory effect. First, Mordi references that the study reported a minority driver was 12% more likely to be stopped than a Caucasian driver. Mordi attempts to impute these statistics to Zeigler because he "conducts traffic stops following the policies and procedures of his law enforcement agency." But the link between Zeigler and these statistics is far too attenuated to show that his actions have a discriminatory effect on the motorists he stops. In fact, there is no statistical data on the stops specifically performed by Zeigler or any of the troopers in his patrol area, nor are there any statistics regarding the racial composition of the population that travels through Zeigler's patrol area. Second, Mordi relies on the

study to show that a higher percentage of consent searches were made of minority drivers (.40%) in comparison to Caucasian drivers (.15%). (Doc. 183, p. 19). However, that data point is completely irrelevant given that the instant case did not involve a consent search.

The statistical evidence provided by Mordi is simply too general to be of any use in establishing discriminatory effect. Other racial profiling cases have likewise found that the use of general statistics is insufficient to establish discrimination. *See, e.g., Lee v. City of South Charleston*, 668 F. Supp.2d 763, 776 (S.D. W.Va. 2009)(awarding summary judgment in favor of officers and against plaintiff on Fourteenth Amendment claim because statewide traffic study submitted by plaintiff was not probative of the city's use of racial profiling because study did not address racial disparity in traffic stops and searches performed by officers employed by the city were the stop took place); *Hankins v. City of Tacoma*, No. C06-5099 FDB, 2007 WL 635771, at *4 (W.D. Wash. Feb. 26, 2007)(holding that plaintiff failed to survive summary judgment despite submission of a study showing racial profiling because evidence failed to show class of similarly situated individuals in area where defendants were patrolling and that were subject to the possibility of traffic stops for similar driving infractions.). Accordingly, even if the Court were to consider Mordi's statistics, they are legally insufficient to establish discriminatory effect.

### B.    Discriminatory Purpose

To establish a violation of the Equal Protection Clause, Mordi also must prove that Zeigler acted with a discriminatory purpose. *See Chavez*, 251 F.3d at 635. This requires Mordi to show that Zeigler acted with intent or deliberate indifference against him

because of membership in a definable class. *See Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996). As with other deliberate indifference cases, a showing of negligence is insufficient. *Id.* at 453. Instead, discriminatory purpose "implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group." *Chavez*, 251 F.3d at 645 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)). Such purpose, for example, can be shown through the use of racially derogatory language, which presents "strong evidence of racial animus." *Chavez*, 251 F.3d at 646. A claimant, however, cannot rely solely on statistics to establish discriminatory purpose. *See Chavez*, 251 F.3d at 647-648. *See also Buchanan*, 592 F. App'x at 508 (noting that "general statistics alone do not plausibly suggest that [the defendant] himself acted with racially discriminatory intent . . . .").

Setting aside the statistical evidence Mordi presented for discriminatory effect, Mordi has presented no other evidence to establish discriminatory purpose. Mordi argues that there is evidence of racial motivation because Zeigler purportedly lied about seeing blunts or blunt materials in Mordi's vehicle and that he had no objective basis to prolong the stop. (Doc. 183, p. 19-20). It is too far of a reach to infer discriminatory purpose based on such evidence, however, especially when the record is devoid of any evidence of racial animus on the part of Zeigler towards Mordi—a fact confirmed by the lack of any derogatory or racially sensitive remarks in the video of the stop. At best, the most that can be inferred from this evidence is that Zeigler wanted to search the vehicle and provide sufficient justification for the search.

The only other piece of evidence that Mordi can point to is his belief that he was stopped because of his race. Specifically, Mordi relies on the fact that Zeigler initiated the traffic stop after driving up and seeing his race and the race of his passenger. Again, such an inference is not supported by the video of the traffic stop; instead, Mordi's belief amounts to nothing more than mere speculation. *See, e.g., McNair v. Merrionette Park Police Dep't*, No. 09-C-1142, 2010 WL 3781021, at *4 (N.D. Ill. Sept. 22, 2010)(noting that the plaintiff presented nothing other than own speculation that the defendant pulled him over because of race even though there was an alleged racial comment which was improper and unprofessional); *Payne v. City of Missoula*, No. CV 10-00056-M-DWM-JCL, 2010 WL 4362827, at *5-6 (D. Mont. Sept. 29, 2010)(finding insufficient circumstantial evidence to establish that race motivated the stop even assuming officer knew driver's race before he pulled him over in part because traffic stop video showed that the officer acted professionally and respectfully to the driver.). Mordi has failed to establish any of the required prongs for his Equal Protection claims, and as such, summary judgment must be granted in favor of Zeigler.

## III.     Trooper Zerrusen

Zerrusen moves for summary judgment arguing that the claims against him fail for lack of personal involvement. (Doc. 177, p. 17-18). A defendant can only be held liable under Section 1983 if he is personally responsible for the deprivation of a constitutional right. *See Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). The undisputed facts show that Zeigler initiated the traffic stop and retained primary authority over the situation at all times. (Doc. 183-1, ¶64). It also undisputed that Zerrusen was not involved with the

decision to pull Mordi over or call for the drug dog. (*Id.* at ¶65). In response, Mordi concedes and agrees that Zerrusen is entitled to summary judgment. (Doc. 183, p. 18). As such, the Court grants summary judgment in favor of Zerrusen.

CONCLUSION

For these reasons, the Court **GRANTS** the motion for summary judgment filed by Defendants Todd Zeigler and Nathan Zerrusen (Doc. 177). The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendants Todd Zeigler and Nathan Zerrusen and against Uche Philip Mordi and to close the case. This entire action is **DISMISSED with prejudice**.

IT IS SO ORDERED.

DATED:  May 12, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**